ORIGINAL

Approved: _____
BRETT M. KALIKOW
Assistant United States Attorney

Before: THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

19MAG4517

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                : **SEALED COMPLAINT**
                                        :
        - v. -                          : Violation of 18 U.S.C.
                                        : §§ 1343 and 2
PEDRO ANDRES OSORIO,                    :
                                        : COUNTY OF OFFENSE:
                Defendant.              : New York, Westchester
                                        :
                                        :

- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ALEXANDER TURCZAK, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Wire Fraud)

        1.    From or about December 2015, up to and including in or about November 2017, in the Southern District of New York and elsewhere, PEDRO ANDRES OSORIO, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, OSORIO defrauded various individuals of slightly less than $1 million by inducing them to invest in or provide loans to a purported liquor distribution company ("Company-1") OSORIO controlled, but which, in reality, did not engage in liquor distribution, and which OSORIO instead used as a means to enrich himself.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2. I am a Special Agent for the FBI. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience and on my examination of various documents and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. Based on my review of corporate registration documents for Company-1, I have learned, in substance and in part, the following:

   a. On or about August 31, 2016, Articles of Incorporation were filed with the Secretary of State for the State of Florida for Company-1 (the "Articles of Incorporation").

   b. The Articles of Incorporation specify that "Pedro A Osorio" is the president and registered agent of Company-1.

4. Based on my interviews with eight victims who made investments in Company-1 (collectively, the "Interviewed Investors"), I have learned, in substance and in part, the following:

   a. From in or about December 2015 to in or about November 2017, PEDRO ANDRES OSORIO, the defendant, solicited various individuals to invest in Company-1 in exchange for shares in the profits of Company-1 or for interest earned on their investments. For many of the Interviewed Investors, OSORIO solicited multiple rounds of investment.

   b. OSORIO told all of the Interviewed Investors that Company-1 was a liquor distribution company. OSORIO made specific statements about Company-1's operations to certain Interviewed Investors, for example, that the Company would import liquor from Colombia for resale in the United States, including, specifically, a liquor called "aguardiente," as well

as Colombian rum, and that Company-1 had customers in Orlando to whom it sold liquor.

c. OSORIO told the Interviewed Investors that he and Company-1 were working in partnership with another liquor distribution company ("Company-2") and the principal of Company-2 ("Individual-2"). Several of the Interviewed Investors indicated that the purported relationship between OSORIO and Company-1, on the one hand, and Individual-2 and Company-2, on the other, was an important factor in their decisions to invest with OSORIO and Company-1.

d. From in or about December 2015 to in or about November 2017, the Interviewed Investors gave money to OSORIO as investments in or loans to Company-1. The money was paid through a variety of methods, including cash deposits, checks, and wire transfers. OSORIO directed the Interviewed Investors to utilize various bank accounts belonging to Company-1, OSORIO, and/or OSORIO's significant other ("Individual-1") for the purpose of making their investment payments. Many of the Interviewed Investors made multiple rounds of investments.

e. In exchange for their investments in Company-1, OSORIO promised the Interviewed Investors that they would receive a share of the profits of Company-1 or interest payments.

f. OSORIO did not execute written contracts or written investment agreements with the Interviewed Investors. Rather, OSORIO made verbal agreements regarding the profits or interest each investor would receive in exchange for their investment in Company-1.

g. OSORIO cumulatively promised the Interviewed Investors more than 100% of the profits of Company-1. For example, in connection with their various investments, OSORIO promised:

i. A husband and wife ("Investor-1" and "Investor-2," respectively) that they would receive their principal invested plus 50% of the profits of Company-1 each month;

ii. An individual ("Investor-3") 45% of the profits from Company-1, and later offered Investor-3 75% of profits from a specific whiskey investment;

3

      iii. Another husband and wife ("Investor-4" and "Investor-5," respectively) 25% of Company-1's profits.

    h. OSORIO also promised various other investors high interest rates in return for their investments. For example, OSORIO promised:

      i. An individual ("Investor-6") 40% interest on a monthly basis;

      ii. An individual ("Investor-7") 10% interest on a monthly basis, or, alternatively, 40% interest on a particular whiskey investment.

    i. OSORIO told Investor-4 not to discuss the terms of their investment arrangement with other investors in Company-1.

    j. Each of the Interviewed Investors received some money back from Company-1 and/or OSORIO, but received less than the total they each had invested.

    k. In or around April 2018, several of the Interviewed Investors met with Individual-2. Individual-2 informed the investors present that Individual-2 and Company-2 did not do business with OSORIO and Company-1. Rather, OSORIO previously worked for Company-2 for approximately five months and was fired.

   5. Based on my review of bank records and other financial documents for accounts held by Company-1, PEDRO ANDRES OSORIO, the defendant, Individual-1, and the Interviewed Investors, as well as my conversations with other law enforcement officers and analysts, I have learned, in substance and in part, the following:

    a. Between in or about December 2015 and in or about November 2017, bank accounts belonging to OSORIO, Company-1, and Individual-1 received approximately $2,060,000 collectively from nine investors (collectively, the "Investors") or entities controlled by specific Investors. During that same time period, bank accounts belonging to the Investors, or entities controlled by the Investors, collectively received approximately $1,070,000 million in funds from OSORIO, Company-1, and/or Individual-1, resulting in a net loss to the Investors' accounts of approximately $990,000.

4

     i. For example, with respect to Investor-1, during the above time period, (1) approximately $640,000 was wire transferred from a bank account belonging to a company controlled by Investor-1 ("Investor-1 Account") into a bank account belonging to Company-1( "Company-1 Account-1"), and (2) approximately $430,000 in payments through wire transfers and checks were made from Investor-1 Account-1 into a bank account belonging to OSORIO (the "Osorio Account-1"). During that same period, approximately $430,000 was returned to Investor-1 Account-1 from Company-1 Account-1; approximately $170,000 was returned to Investor-1 Account-1 from Osorio Account-1; and approximately $100,000 was returned to Investor-1 from a bank account belonging to Individual-1 ("Individual-1 Account-1". In all, Investor-1 Account-1 incurred a net loss of approximately $370,000.

    b. On or about January 3, 2017, Investor-4 initiated a wire transfer for approximately $12,000 from Investor-4's bank account to Company-1 Account-1. The wire transfer was initiated at a bank branch located in Mt. Kisco, New York. On the wire transfer record, the address for the receiving bank is listed as Charlotte, North Carolina.

    c. During the course of the fraud scheme, OSORIO used new money provided by the Investors to pay money to other Investors or to return money to the same Investors. For example:

     i. On or about September 15, 2016, a $50,000 check from a bank account belonging to Investor-3 was deposited into Individual-1 Account-1; that same day, a $50,000 check drawing on Individual-1 Account-1 was deposited into Company-1 Account-1. On or about September 29, 2016, a $40,000 wire from Company-1 Account-1 was sent to Investor-1 Account-1. No additional money was added, and less than $3,000 was removed, from Company-1 Account-1, between those transactions.

     ii. On or about May 11, 2017, Investor-4 deposited approximately $50,000 into Company-1 Account-1. On or about May 12, 2017, an approximately $50,000 wire transfer was made from Company-1 Account-1 to Investor-1 Account-1. No other money was added to Company-1 Account-1 between those transactions.

    d. From in or about September 2016, when Company-1 Account-1 was opened, to in or about November 2017, no payments were made from or to Company-1 Account-1 which, based on my training and experience, appear to be related to the

5

commercial production, sale, purchase, or distribution of liquor.

   e.   From in or about September 2016, to in or about November 2017, Company-1 Account-1 was used to make numerous payments which, based on my training and experience and publicly available information, appear to be related to personal expenses unrelated to the commercial production, sale, purchase, or distribution of liquor. For example:

   i.   Approximately $31,000 was paid to a car dealership and an auto repair shop;

   ii.   Approximately $10,000 was paid to air travel companies and approximately $9,000 was paid to a cruise company;

   iii.   Approximately $14,000 was paid to online and brick and mortar big box, grocery, and drug stores;

   iv.   Approximately $8,000 was paid to clothing retailers and department stores;

   v.   Approximately $6,000 was paid to an electronics retailer;

   vi.   In or about October 2016, approximately $1,000 was paid to a tattoo parlor;

   vii.   In or about November 2016, approximately $20,000 was paid to a furniture store;

   viii.   In or about November and December 2016, approximately $4,000 was paid to high end jewelry and fashion retailers;

   ix.   On or about May 8, 2017, approximately $150 was paid to a toy store.

   WHEREFORE, deponent respectfully requests that an arrest warrant be issued for PEDRO ANDRES OSORIO, the defendant,

6

and that he be arrested and imprisoned or bailed, as the case may be.

_____
Alexander Turczak
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10th day of May, 2019

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK